## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CINDY TAYLOR,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:08CV00032 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | Chief United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Roger W. Rutherford, Wolfe, Williams, Rutherford & Reynolds, Norton, Virginia, for Plaintiff; Allyson Jozwik, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

### I

The plaintiff Cindy Taylor filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for supplemental security income ("SSI") benefits under title XVI of the Social Security Act ("Act"), 42 U.S.C.A. §§ 1381-1383d (West 2003 & Supp. 2009). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 1383(c)(3) and 42 U.S.C.A. § 405(g) (West Supp. 2009).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, the court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decision. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The plaintiff protectively applied for SSI benefits on March 9, 2006, alleging disability beginning March 19, 2004.[1] (R. at 68-71, 84-91.) The plaintiff claimed disability by reason of degenerative herniated lumbar disc, degenerative disc disease, spinal cysts, and left leg pain. (R. at 84-85.) Her claim was denied initially on May 18, 2006 (R. at 40, 46-50), and upon reconsideration on February 12, 2007 (R. at 41, 53-55). At her request, the plaintiff received a hearing before an administrative law judge ("ALJ") on November 1, 2007. (R. at 26-39.) At that time, a vocational expert

---

[1] The plaintiff filed a prior unsuccessful application for SSI benefits on March 19, 2004, which also alleged an onset date of disability of March 19, 2004. (R. at 61-65.) The claim was denied on June 14, 2004, because the plaintiff had resources in excess of the limit for the means-based SSI program. (R. at 42-45.)

- 2 -

and the plaintiff, who was represented by counsel, testified. (*Id.*) By decision dated December 18, 2007, the ALJ denied the plaintiff's claim for SSI benefits. (R. at 12-23.)

The plaintiff filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council ("Appeals Council"), but her request was denied on May 23, 2008. (R. at 5-8.) Thus, the ALJ's opinion dated December 18, 2007, constituted the final decision of the Commissioner. The plaintiff then filed her Complaint with this court on July 8, 2008, objecting to the final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed the issues. The case is now ripe for decision.


II

The summary judgment record reveals the following facts. The plaintiff was thirty-four years old on the date of the hearing before the ALJ (R. at 17, 68), making her a "younger person" under the Commissioner's Regulations. *See* 20 C.F.R. § 416.963(c) (2009). She has a high school education. (R. at 90.) She has worked as a cook, clerical assistant, personal assistant, waitress, sales clerk, and candle salesperson. (R. at 17-18, 85-86, 95-104, 115-122, 132-39, 157, 164, 251, 287.) She

- 3 -

claims disability due to degenerated herniated lumbar disc; degenerative disc disease; spinal cysts; pain in the shoulders, neck, spine, and low back; and panic attacks. (R. at 17.) The initial denial of her claim was accompanied by a notice dated May 16, 2006, that the claimant would be expected to perform the light work involved in jobs such as mail clerk, cafeteria attendant, or laundry folder. (R. at 123.)

The plaintiff's medical history is as follows. An MRI on November 17, 2003, showed that the lumbar spine vertebral bodies had normal alignment, height, and signal intensity. (R. at 160.) There was a narrowing of the L3-4, L4-5, and L5-S1 disc spaces, with disc desiccation predominately at L5-S1. (*Id.*) The L1-2, L2-3, and L3-4 level discs were intact. (*Id.*) The L4-5 level had some "minimal degenerative change in the annulus . . . no focal herniation . . . some minimal facet hypertrophy . . . [and] [n]o significant central canal or foraminal stenosis." (*Id.*) The L5-S1 level had "a broad annular tear posteriorly at the central and right lateral aspect of the disc." (*Id.*) G. Thomas Haines, M.D., noted that there was "a small eccentric broad based protrusion of the disc at the same level, with some minimal effacement of the anterolateral thecal sac." (*Id.*) A followup CT scan of the abdomen and pelvis on January 6, 2004, revealed some small densities near the aorta that may have represented small veins, and multiple small cysts on the plaintiff's kidneys. (R. at 158.)

- 4 -

Todd A. Cassel, M.D., served as the plaintiff's primary care physician. The plaintiff received refills of her Xanax and Lortab prescriptions in February 2005. (R. at 180.) On April 27, 2005, the plaintiff reported that her pain was about the same and her mood was "ok." (R. at 179.) Her prescriptions for Xanax and hydrocodone were renewed. (*Id.*) Dr. Cassel received a message from the plaintiff on June 13, 2005, asking for more Xanax because she had a death in the family. (R. at 178.) After a checkup on June 27, 2005, Dr. Cassel wrote that the plaintiff had left-side twinging pains, and that "[a]fter she eats she gets pain in her upper [abdomen] sometimes with a little nausea." (R. at 177.) The plaintiff had told him that she "[h]ad a really bad anxiety attack the first day she took the patches to quit smoking and went back to smoking." (*Id.*) Dr. Cassel assessed that the plaintiff had low back pain, and possibly had gastritis. (*Id.*) He prescribed hydrocodone and Pepcid. (*Id.*)

On June 28, 2005, Dr. Cassel wrote a letter for the plaintiff "To Whom It May Concern," explaining that she had problems with a herniated lumbar disc and radiculopathy. (R. at 176.) He wrote, "This has bothered her for some time and has significantly limited her ability to work. This work limitation (mainly in lifting, bending and stamina) continues at this time and for the foreseeable future. It does not interfere with her abilities to take care of her children." (*Id.*)

- 5 -

The plaintiff visited Dr. Cassel on July 11, 2005, after a visit to the emergency department on July 2, 2005, where she complained of abdominal pain. (R. at 175, 216-18.) She had increasing pain on her left side. (R. at 175.) Dr. Cassel prescribed Percocet and Lortab. (*Id.*) He noted that an MRI might be needed, but he would "have to see if she can have payment for her tests that need to be done." (*Id.*) On July 29, 2005, Dr. Cassel wrote two letters to the plaintiff explaining that she was having difficulties with her back pain that was beginning to impinge more and more on her ability to work and to carry out the activities of daily living, and he recommended an MRI and possibly a surgical consultation. (R. at 173-74.) He advised the plaintiff to seek assistance from the Department of Rehabilitation because she had no health insurance. (*Id.*)

The plaintiff had a checkup with Dr. Cassel on August 23, 2005. (R. at 172.) She reported that the pain in the left side of her back got worse after eating and when she was positioned in certain postures. (*Id.*) Dr. Cassel noted that the plaintiff had degenerative disc disease with chronic back pain and that her anxiety was stable. (*Id.*) He prescribed hydrocodone and Xanax. (*Id.*)

An MRI of the lumbar spine on January 19, 2006, showed that the T12-L1, L1-2, L2-3, L3-4, and L4-5 disc space levels were normal. (R. at 192.) Radiologist Thomas F. Pugh, M.D., noted that there was no evidence of disc extrusion, central

- 6 -

canal stenosis, conus compression, nerve root compression, fracture, dislocation, or bony destructive lesion at those levels. (*Id.*) However, there was a small broad-based disc protrusion at L5-S1 and an associated annular fissure. (*Id.*) Disc material was in contact with the right S1 nerve root, but caused no identifiable S1 nerve root compression or displacement. (*Id.*) There was a cystic mass adjacent to the L5-S1 facet joint. (*Id.*) There was also a cystic mass immediately anterior to the L2 vertebral body. (*Id.*)

On January 25, 2006, Dr. Cassel wrote that the plaintiff had returned because "she is in so much pain. She has a knot that comes up in the left lower back, radiates across [the] lower ribs as before. Still has numbness down the left leg, occasional discomfort on the right, worried about the L2 lesion." (R. at 171.) He observed that the plaintiff appeared to have a benign cystic lesion anterior to L2 in the spine. (*Id.*) Dr. Cassel also wrote that she "[h]as that one level of degenerative disc disease with pushing to the right. Her symptoms are mainly to the left again. May very well have pinched nerve sciatica on that left side but it makes it difficult to assess how serious the degenerative disc disease is." (*Id.*) Dr. Cassel prescribed Percocet, but "[d]id not know what to suggest other than [a] consultation she cannot afford." (*Id.*)

On February 24, 2006, the plaintiff visited the emergency department for treatment of a migraine headache that she described as the worse headache she had

ever had.  (R. at 221.)  She reported that she had a panic attack earlier that evening.  (*Id.*)  The treating physician noted that the plaintiff had experienced a temporary loss of consciousness, was sensitive to light and sound, and had difficulty ambulating due to back pain.  (*Id.*)  The plaintiff reported that the pain had started in her back and had moved to her head.  (R. at 223.)  She refused a CT scan because she did not have insurance.  (R. at 222.)  The plaintiff was treated with Demerol and Phenergan.  (R. at 225.)

On March 7, 2006, the plaintiff told Dr. Cassel that her back pain had been about the same, but she had had a headache all day and had passed out.  (R. at 170.)  She had decided to separate from her husband, so she was under a lot of stress.  (*Id.*)  Dr. Cassel diagnosed back pain and degenerative disc disease; situational difficulties and some anxieties; synocope, probably secondary to relative dehydration, pain, and lying down for [a] long period of time that day; and muscle contraction, headaches, and some migraines.  (*Id.*)  He prescribed hydrocodone and Xanax.  (*Id.*)

On March 9, 2006, the same date that the plaintiff protectively filed for SSI benefits, Dr. Cassel signed a letter stating that she "is unable to work at this time and this limitation will continue for the foreseeable future," however, "[s]he is able to care for her children."  (R. at 169.)  On April 12, 2006, Dr. Cassel filled out a form regarding the plaintiff's work-related limitations for the Virginia Department of

- 8 -

Social Services.  (R. at 167-68.)  Dr. Cassel stated that the plaintiff was unable to work for a period greater than ninety days due to degenerative disc disease and back and leg pain.  (R. at 167.)  He noted that she could not lift objects heavier than five pounds, bend over, stoop down, reach for objects, sit or stand for longer than one hour at a time, or walk farther than fifty feet.  (R. at 168.)  Dr. Cassel stated that he had advised the plaintiff to reduce her work hours for health-related reasons, but he had not advised her to take a health-related leave of absence, to quit her job, or to apply for disability.  (*Id.*)

On May 5, 2006, Dr. Cassel noted that the plaintiff had separated from her husband and was doing "pretty well with her nerves," though she had chronic back pain, anxiety, and panic.  (R. at 166.)  He prescribed hydrocodone and Xanax.  (*Id.*)  He encouraged the plaintiff to use nicotine patches to help her stop smoking, but she indicated that she would rather try the gum.  (*Id.*)  After a checkup on June 29, 2006, Dr. Cassel noted that "[i]f she carries a 5-pound basket of candles to sale [sic], she is really hurting for two or three days after that."  (R. at 164.)  She was "[h]aving some more panic attacks, but [was] trying to work things out through the divorce."  (*Id.*)  Dr. Cassel noted that her diagnoses were degenerative disc disease with back pain, and anxiety and depression from situational difficulties, and he prescribed hydrocodone and Xanax.  (*Id.*)  He concluded that "[s]he is unable to work at this

- 9 -

time or for the foreseeable future." (*Id.*) The plaintiff visited the emergency department for treatment of her back pain on May 20 and August 20, 2006. (R. at 207-14.)

After a checkup on August 21, 2006, Dr. Cassel wrote that the plaintiff "is tired of pain medicines and wants to go to [a] neurosurgeon." (*Id.*) He prescribed Percocet, Lortab, and Xanax. (*Id.*) On September 5, 2006, Dr. Cassel noted on the plaintiff's chart, "Notify p[atient] that it is hard to justify another MRI of the lumbar spine, muscles [in] the neck [and] middle back." (*Id.*) The plaintiff received refills of Lortab and Xanax on September 20, 2006. (R. at 163.)

The plaintiff was referred to a neurologist, Michael J. Winsor, M.D., for nerve conduction velocity studies and an EMG of her left leg on November 21, 2006. (R. at 249.) The tests showed normal motor conduction in the left peroneal nerve and left tibial nerve, normal sensory studies of the left sural nerve, and normal needle electrode examination of the left leg and back, showing no evidence of lower motor neuron involvement. (*Id.*)

A CT scan of the abdomen on December 14, 2006, showed follicular cysts in the left ovary and suggested that a pelvic ultrasound would provide more information. (R. at 190.) A CT scan of the lumbar spine on December 28, 2006, showed minimal or slight disc bulges at L4-5 and L5-S1 with no herniation, stenosis, or nerve root

- 10 -

compression.  (R. at 184-85.)  A lumbar myelogram conducted on the same date showed a minor anterior extra-dural defect at L4-5 with slight left lateral recess narrowing and no central stenosis.  (R. at 186-87.)  The remainder of the invertebral discs appeared essentially normal, and there was no evidence of instability.  (R. at 187.)

On January 8, 2007, the plaintiff visited the emergency department for treatment of a migraine headache.  (R. at 203-06.)

On January 23, 2007, the plaintiff attended the first of several scheduled physical therapy sessions to rehabilitate the lumbar spine.  (R. at 250-51.)  She reported to the physical therapist that her back first started troubling her after she lifted a large tree trunk and felt a pop.  (R. at 251.)  She stated that her back would go out about once every two months, and during those episodes, she would rest and only get up to eat and use the restroom.  (*Id.*)  She would recover after an episode after a couple days.  (*Id.*)  An examination by the physical therapist revealed that the plaintiff could flex, extend, and rotate the lumbar and her lower quarter at 4/5, and the goal was to increase the range of motion to 4+/5.  (R. at 252-53.)  The physical therapist noted that the plaintiff's purse weighed more than ten pounds.  (R. at 252.)  During the physical therapy session, the plaintiff was educated on proper sitting posture and the importance of reducing the weight of her purse, and she received moist heat

- 11 -

treatment. (R. at 250.) The plaintiff called to cancel the next two appointments and did not show up for the third subsequent appointment. (*Id.*) The physical therapist noted, "Rehab potential for this patient is good if she is compliant with home exercise program and the plan of care." (R. at 253.)

The plaintiff cancelled an appointment with Dr. Cassel on May 7, 2007, because her back was out and she could not make it to the office. (R. at 265.) The appointment was re-scheduled for May 15. (*Id.*) On May 15, 2007, the plaintiff reported that her back pain was "excruciating" and that she "had been on her feet a lot." (R. at 263.) Dr. Cassel noted that the plaintiff exhibited "lots of back tightness and tenderness, particularly at the upper left lumbar with that radiating sensitivity." (R. at 264.) He indicated that she was taking Xanax, Lortab, Percocet, and Cymbalta. (R. at 263.) A checkup on June 5, 2007, revealed "[n]o real changes," and the same medications were prescribed. (R. at 262.)

On July 7, 2007, Dr. Cassel filled out another form regarding the plaintiff's work-related limitations for the Virginia Department of Social Services. (R. at 256-57.) He based his conclusions on an examination conducted in June 2007. (R. at 256.) He stated that the plaintiff was unable to work for an unknown duration greater than ninety days primarily due to back pain, and also due to depression and a panic disorder. (*Id.*) Dr. Cassel noted that the plaintiff could not lift objects heavier than

- 12 -

five pounds, bend over, stoop down, reach for objects, sit or stand for longer than one hour, walk farther than fifty feet, or relate well with co-workers. (R. at 257.) He stated that he had advised the plaintiff to reduce her work hours and take a leave of absence from work for health-related reasons, but he had not advised her to quit her job or to apply for disability. (*Id.*) He indicated that she was complying with medication and physical therapy, and that she was able to care for her children. (*Id.*)

On July 9, 2007, Dr. Cassel faxed a prescription for Maxilt to a pharmacist at the plaintiff's request in order to treat headaches. (R. at 261.)

On July 11, 2007, Karen Odle, L.P.C., wrote a message to Dr. Cassel stating that she was concerned that the plaintiff might be bipolar because "[s]he has the racing thoughts and mood swings." (R. at 260.) She asked Dr. Cassel to consider prescribing a mood stabilizer at the plaintiff's next scheduled appointment on July 17, 2007. (*Id.*)

On July 17, 2007, the plaintiff reported mood changes and depression to Dr. Cassel. (R. at 258.) She indicated that she had taken Cymbalta to help her sleep, and she had a bad reaction, including swelling and tightening of the throat. (*Id.*) Dr. Cassel assessed that the plaintiff had low back pain, anxiety, and depression, and he prescribed Neurontin capsules "to help pain and rest," along with Percocet, Lortab,

- 13 -

and Xanax.  (*Id.*)  Dr. Cassel faxed a refill prescription for Xanax and Lortab to the plaintiff's pharmacy on August 31, 2007.  (R. at 282.)

At a checkup on October 2, 2007, the plaintiff reported that her pain pattern had been about the same, or maybe worse; she had some sharp pains in her left ribs. (R. at 280.)  The Neurontin made her sick and disoriented.  (*Id.*)  Dr. Cassel again prescribed Percocet, Lortab, and Xanax for the plaintiff's low back pain.  (*Id.*)  Dr. Cassel also filled out a medical evaluation for the Virginia Initiative for Employment Not Welfare Program ("VIEW").  (R. at 283-84.)  He indicated on the form that the plaintiff was unable to participate in employment and training activities in any capacity for an unknown duration exceeding sixty days.  (R. at 283.)  He stated that her physical limitations were low back pain, radiculopathy, and degenerative disc disease, and that her psychiatric limitations were intermittent anxiety and depression with chronic pain; the primary medical reason for the plaintiff's inability to participate in employment and training activities was the degenerative disc disease and radiculopathy.  (R. at 284.)  Dr. Cassel noted that the plaintiff was complying with prescribed medication, physical therapy, and any other treatments prescribed. (*Id.*)

On January 7, 2008, the plaintiff reported to Dr. Cassel that her depression had increased with no particular event setting it off.  (R. at 287.)  She also said that her

- 14 -

right leg was "starting to hurt at times," that she "had to quit her candle business because of the pain," and that her children were helping her with some of the housework. (*Id.*) Dr. Cassel prescribed Paxil for depression and Percocet for pain. (R. at 288.) He also filled out a medical evaluation for VIEW that was nearly identical to the evaluation completed on October 2, 2007, except that on this occasion he specified that she was unable to participate in training activities for thirty-one to sixty days, rather than for more than sixty days. (R. at 292-93.)

During a checkup on February 15, 2008, the plaintiff indicated that her back had gone out for two and one-half weeks, but that she had no new leg pains. (R. at 290.) She had more panic attacks, but her mood was "ok" and her life was "not as stressed." (*Id.*) A general examination revealed that she was "tender on the left side and flank as always." (*Id.*) Dr. Cassel prescribed Xanax for depression and Percocet and Lortab for low back pain. (R. at 290-91.)

In a Function Report submitted to the Social Security Administration on May 1, 2006, the plaintiff stated that she did light housework such as washing laundry and cooking meals. (R. at 107.) She also noted that she took care of her children and had no problems associated with personal care tasks such as dressing and bathing. (R. at 108.) She was able to drive a car, shop for groceries, pay bills, and handle money. (R. at 110.) She indicated that she could not mow the lawn because riding mowers

- 15 -

and push mowers caused her pain. (R. at 109-10.) But in a disability report submitted in July of 2006, the plaintiff stated that her pain had become more severe, and that the changes in her condition occurred in March of 2004. (R. at 124.) She wrote that "pain becomes so severe at times I have trouble carrying out daily activities." (R. at 127.) She stated that she could no longer mow the lawn or ride in a vehicle for a long time. (*Id.*) She also noted that she had panic attacks when the pain became severe. (R. at 128.)

In a Function Report submitted on September 27, 2006, the plaintiff's description of her daily activities was significantly different than in May 2006. She stated that she started her day by taking medication and that she would "lay in bed until [the] medication helps." (R. at 140.) After getting her children ready for school, she would lay down again for two hours before washing dishes and straightening up the house. (*Id.*) She noted that sometimes she could not go out by herself and someone would accompany her. (R. at 143-44.) Although she stated in May that she was good at following written and spoken instructions and good at handling changes in routine (R. at 112-13), in September she said that her ability to follow written instructions was "poor," her ability to follow spoken instructions was "fair," and she was "not good" at handling changes in routine (R. at 145-46). The plaintiff maintained, however, that she was able to complete tasks such as dressing, bathing,

cooking, cleaning, washing laundry, shopping for groceries, and paying bills. (R. at 141-43.)

As part of the disability determination, Thomas Phillips, M.D., a state agency physician, completed a form on May 16, 2006, assessing the plaintiff's residual functional capacity ("RFC"). (R. at 229-35.) Dr. Phillips noted that the plaintiff had a medically determinable impairment of degenerative disc disease. (R. at 235.) He concluded that the plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk or sit for about six hours with normal breaks, and push or pull the same weights that she could lift. (R. at 230.) He stated that she could frequently balance and climb stairs and ladders, but could only occasionally stoop, kneel, crouch, or crawl. (R. at 231.) Dr. Phillips noted that Dr. Cassel had stated on March 9, 2006, that the plaintiff was unable to work, but that there was nothing in the file that differed significantly from Dr. Phillips' findings regarding the plaintiff's RFC. (R. at 233.) Dr. Phillips considered the plaintiff's self-reported daily activities in assessing her functional limitations, such as her ability to prepare sandwiches and frozen meals, wash laundry, shop for groceries, perform household chores, and care for her personal needs. (R. at 235.) He concluded that her allegations of severe functional limitations were not credible and were not documented or supported. (*Id.*)

- 17 -

Another consultant, Joseph S. Leizer, Ph.D., reviewed the plaintiff's file on May 16, 2006, for a possible psychiatric disability. (R. at 236-48.) Dr. Leizer concluded that the plaintiff did not have any of the following limitations: (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence, or pace, (4) repeated episodes of decompensation, each of extended duration. (R. at 246.) He stated that the plaintiff did not have an actual psychiatric diagnosis, although her treating physician Dr. Cassel had noted some anxiety problems due to situational difficulties. (R. at 248.) He noted that her activities of daily living were not significantly limited by any anxiety problems. (*Id.*) He concluded that her allegations were not fully credible and that she should be able to perform the mental demands of all levels of work. (*Id.*)

The evidence in this case also includes the plaintiff's testimony regarding her subjective claims and her activities of daily living. The plaintiff testified that she had pain all the way across her back below the belt line, and that the pain would move up her spine, across her shoulder blades, and down to her left leg, calf, and ankle. (R. at 31.) In addition to taking medication to alleviate the pain, she would sometimes lay down or take a hot shower. (*Id.*) She would lay down on a bed or in a recliner for about twenty to thirty minutes four or five times per day. (R. at 32.) When her pain

- 18 -

was at the level where she needed to lie down, she would lose concentration and would sometimes have panic attacks. (R. at 35.) Pain medication helped her get back up and resume what she had been doing to a certain point, but she was never pain free. (R. at 36.)

The plaintiff testified that she could do light housekeeping such as cooking and cleaning for fifteen to thirty minutes at a time before taking a break. (R. at 32.) She had a friend who helped her shop for groceries. (R. at 33.) For the past year, her father had been taking out the trash and mowing the grass. (*Id.*) Before the last year, the plaintiff had mowed the grass on a riding lawnmower, but she would stop for breaks. (*Id.*) She said that during the last few months that she had been working as a personal assistant, she could hardly lift. (R. at 29.) She would "stand and cry it would hurt so bad." (*Id.*) She had started missing work, and sometimes she had left work early because of the pain. (*Id.*) The plaintiff testified that she had attended one physical therapy session, but she had stopped going because she had experienced severe muscle spasms and Dr. Cassel had recommended ceasing therapy. (R. at 31.)

Following the plaintiff's testimony, a vocational expert, Cathy Sanders, testified regarding jobs available for a hypothetical individual of the same age,

experience, educational background, and RFC as the plaintiff.[2]  The ALJ described

the hypothetical individual as able to do light work, including occasionally kneeling,

crouching, crawling, and stooping.  (R. at 36.)  The vocational expert testified that

such an individual could do generic jobs such as care giver, store clerk, or restaurant

server.  (R. at 36.)  She could also work as an entry level office assistant or ticket

clerk.  (*Id.*)  Part of the range of jobs for cashiers, counter clerks, interviewers,

couriers, information clerks, parking lot attendants, telephone answering service

personnel, receptionists, sorters, and folders would be available.  (R. at 36-37.)  The

vocational expert testified that there were 27,500 folder jobs within 150 miles of

Kingsport, Tennessee, where the hearing was held, and three million such jobs in the

United States.  (R. at 37.)

The ALJ then asked the vocational expert whether the same hypothetical

person would have any job opportunities if she were subject to the additional

limitations the plaintiff alleged in her testimony.  (R. at 37.)  The vocational expert

opined that no jobs would be available to such an individual.  (*Id.*)  She also testified

that if the hypothetical individual were actually limited to lifting no more than five

pounds, was limited in her ability to bend over, stoop down, and reach, could not sit

---

[2]  The vocational expert did not discuss the plaintiff's past relevant work.  The ALJ noted in his opinion that none of the plaintiff's prior work qualified as past relevant work. (R. at 17.)

Case 2:08-cv-00032-JPJ-PMS   Document 16   Filed 08/10/09   Page 20 of 28   Pageid#: 79

or stand for more than one hour, and could not walk farther than fifty feet at one time, she would not be able to perform any of the above-mentioned jobs and would not be able to perform any of the plaintiff's past work. (R. at 38.)

### III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A) (West Supp. 2009).

The Commissioner applies a five-step sequential evaluation process in assessing SSI claims. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. § 416.920(a)(4) (2009). If it is determined at any point in the five-step analysis that the claimant is not disabled, then

the inquiry immediately ceases. *See id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The fourth and fifth steps in this inquiry require an assessment of the claimant's RFC, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *See* 20 C.F.R. § 416.960(b), (c) (2009).

My review is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision and whether the correct legal standard has been applied. 42 U.S.C.A. § 405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence exists, the final decision of the Commissioner must be affirmed. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays*, 907 F.2d at 1456.

The plaintiff contends that the ALJ's decision was not supported by substantial evidence. Specifically, the plaintiff argues that the ALJ erred when he found that the

Case 2:08-cv-00032-JPJ-PMS   Document 16   Filed 08/10/09   Page 22 of 28   PageID#: 81

plaintiff's low back pain and mental illnesses were not severe impairments. I disagree.

The ALJ concluded that Taylor had medically determinable impairments of chronic low back pain and anxiety attacks, but found that Taylor's statements concerning the intensity, persistence, and limiting effects of her alleged symptoms were not credible and that her impairments were not "severe." In the alternative, the ALJ determined that even if Taylor was limited to light work due to her back problems, she would not be disabled because there were a significant number of jobs in the national economy for an individual with Taylor's vocational profile. The ALJ's decision is supported by substantial evidence.

A medically determinable impairment is "severe" if it significantly limits an individual's physical or mental ability to do basic work activities. 20 C.F.R. § 416.921 (2009). Basic work activities are the abilities and aptitudes necessary to do most jobs, including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling, and mental capacities such as understanding and carrying out simple instructions, using judgment, responding appropriately to supervision, and dealing with changes in a work setting. *Id.* If a claimant does not have a severe impairment or combination of impairments that meet

Case 2:08-cv-00032-JPJ-PMS  Document 16  Filed 08/10/09  Page 23 of 28  Pageid#: 82

the twelve-month durational requirement, she will be found not disabled. 20 C.F.R. § 416.920(c).

There is substantial evidence that Taylor's mental impairments were not severe. Taylor was never treated by a psychiatrist or psychologist as a result of a mental impairment, though she received treatment from her primary care physician Dr. Cassel for anxiety, depression, stress, situational difficulties, panic attacks, and sleep disturbances. Most of Taylor's complaints of anxiety and depression were related to specific stressful events in her life, such as the death of a family member, her impending divorce and ultimate divorce from her husband, and her battle to quit smoking. Dr. Cassel noted that her anxiety was "situational" and "intermittent." (R. 170, 284.) He prescribed Xanax, which appeared to control her symptoms adequately.

Dr. Leizer, a reviewing state agency psychologist, opined on May 16, 2006, that Taylor had a nonsevere anxiety-related disorder that resulted in no functional limitations. The plaintiff points out that there is additional evidence from the time period after May 2006 that Dr. Leizer was not able to consider. For instance, on July 11, 2007, a counselor raised a concern that Taylor might be bipolar. But Taylor was never diagnosed with bipolar disorder by the counselor, Dr. Cassel, or a psychiatrist

- 24 -

or psychologist. The remainder of the medical records after May 2006 are not significantly different from what Dr. Leizer was able to consider.

Based on the above, the ALJ rated Taylor's functional limitations in the areas of activities of daily living, social functioning, and concentration, persistence and pace as "mild." The ALJ also noted that Taylor had experienced no known episodes of deterioration or decompensation. *See* 20 C.F.R. § 416.920a(c)(3) (2009). Therefore, in compliance with 20 C.F.R. § 416.920a(d)(1) (2009) and based on substantial evidence, the ALJ properly concluded that Taylor's mental impairment was not severe.

Regarding Taylor's physical complaints, the ALJ reviewed the extensive medical evidence showing the basis for Taylor's low back pain, including the MRI on November 17, 2003; the CT scan on January 6, 2004; the MRI on January 19, 2006; records from several visits to the emergency department for migraine headaches and back pain; and notes from Taylor's primary care physician and her physical therapist. The ALJ properly concluded that Taylor had a medically determinable impairment. However, the ALJ noted several factors that cut against the alleged severity of Taylor's physical impairment. For instance, Taylor admitted that she was able to talk with friends, care for her two children, shop at the grocery store or Wal-Mart, mow the yard with a riding lawn mower, cook, clean, and do laundry.

- 25 -

She worked as a personal assistant and made and sold candles after the claimed onset of disability.

Dr. Cassel opined that Taylor could not lift objects heavier than five pounds and that she was unable to work. The ALJ rejected Dr. Cassel's opinions because they were not supported by objective evidence and were inconsistent with his own treatment notes. Although opinions from treating physicians are normally accorded greater weight than reports and opinions from medical sources who have not examined the claimant, 20 C.F.R. § 416.927(d)(1) (2009), opinions by medical doctors that are internally inconsistent or inconsistent with the other evidence of record are given little or no weight. 20 C.F.R. §§ 416.927(c)(2), (d)(4) (2009). Taylor demonstrated that she could lift objects heavier than five pounds when she brought a ten-pound purse to her first physical therapy session. The physical therapist noted that Taylor's potential for rehabilitation was good if she complied with the plan of care, but Taylor cancelled two subsequent appointments and did not show up for the remainder. The nerve conduction study on November 21, 2006, was normal and showed no evidence of radiculopathy. The lumbar myelogram and CT scan showed only slight disc bulging with no evidence of herniation, stenosis, or nerve root compression. Therefore, the ALJ concluded, based on substantial evidence, that Taylor's physical limitations were mild.

Dr. Phillips, a reviewing state agency physician, opined that Taylor could lift and carry a maximum of twenty pounds occasionally and ten pounds frequently, could stand and walk with normal breaks for a total of about six hours in an eight-hour workday, could sit with normal breaks for a total of about six hours in an eight-hour workday, and could only occasionally stoop, kneel, crouch, or crawl. The plaintiff contends that Dr. Phillips' report indicates that Taylor suffered from a severe physical impairment; however, Dr. Phillips concluded that Taylor's allegations of severe functional limitations were not credible and were not documented or supported.

In addition, the ALJ noted that even if Taylor's low back pain was severe, Taylor was not disabled because, as the vocational expert testified, there were jobs available in the national economy for an individual with Taylor's RFC. Therefore, even if the ALJ's finding regarding the severity of Taylor's physical impairment was in error, remand would not be necessary because there is no question that the ALJ would have reached the same result notwithstanding the error. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994).

Accordingly, I find that there is substantial evidence to support the ALJ's decision.

- 27 -

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the Commissioner's Motion for Summary Judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.


DATED: August 10, 2009

 /s/ JAMES P. JONES
Chief United States District Judge